# IN THE OREGON TAX COURT

William L. MIKKELSON

*v.*

## DEPARTMENT OF REVENUE

(TC 3116)

Gary E. Norman, Scott & Norman, represented plaintiff.

Rochelle Nedeau, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Decision for plaintiff rendered December 6, 1991.

**CARL N. BYERS, Judge.**

The subject of this appeal is a self-storage facility in Albany. The facility is situated on 3.12 acres, 1.12 acres of which is undeveloped "excess land." The facility has seven separate buildings containing a total of 33,254 square feet. There is 30,550 square feet of net rentable area, excluding the manager's apartment. The improvements are of average quality except for the superior brick exteriors. They are in average to good condition except, as of the assessment date, the roofs needed replacing. There are 291 rentable storage units, excluding the graveled outdoor storage area.

Plaintiff appeals an assessed value of $860,000 as of January 1, 1990. Plaintiff contends in his amended complaint that the true cash value as of the assessment date was no more than $520,000.

Plaintiff and a partner constructed the improvements between 1973 and 1976. Later, a dispute arose between them and the partner offered to buy the property for $558,000.[1] Plaintiff countered by offering to buy the property himself for that price and the partner agreed.

Shortly thereafter, plaintiff began trying to sell the property. Both plaintiff and his expert witness testified that self-storage properties are not marketed like other types of real estate. They are not listed with realtors and sold in the open market. The market for established self-storage units is primarily other owners and operators. One reason for this is that financial institutions require experienced operators before they will finance a purchase. Consequently, most marketing of properties like the subject is done by word of mouth.

Plaintiff testified that a sale is now pending on the property. Plaintiff is selling the property, except one acre of land, for $497,000. The one acre has no access and is estimated by plaintiff to be worth $30,000. The sale and one acre indicates a total value for the subject of $527,000.

Plaintiff's expert witness testified that self-storage facilities sale prices are based on their actual income. He stated that buyers will use an average of the net operating income (NOI) for three years preceding the sale and divide it by an overall capitalization rate to determine the price. In his opinion, the capitalization rate for self-storage facilities in Oregon ranges from 10.5 percent to 12 percent. As an investor, if buying for himself, he would use a capitalization rate of 12 percent. He testified the subject's average annual NOI for the three years prior to the assessment date in question was $64,600. Dividing $64,600 by 12 percent gave him an indicated value of $538,000. This witness testified that other real

---

[1] Although not made explicit by plaintiff's testimony, the court understands the $558,000 represents the value placed on the entire property and not just the partner's interest.

estate appraisal methods are "irrelevant" because the market does not use those methods.

Defendant's appraiser submitted perhaps the most professional appraisal report yet submitted to this court. With detailed reasoning and data he analyzed the subject property using the three traditional approaches to value. He gave the most weight to the income approach, since his comparable sales were not particularly good and he saw the cost approach as providing only a lower limit of value for investment property.

Defendant's appraiser disagreed with plaintiff in a number of areas. The appraiser believed plaintiff's actual rents were too high. In his income projections, the appraiser projected lower rents with a lower vacancy rate but a higher gross income. He explained that the potential gross income thus estimated was the "best case scenario." He also found plaintiff's management expenses were higher than market. By reducing plaintiff's expenses, the appraiser derived an annual NOI of $89,185. He divided this amount by his overall capitalization rate of 10.75 percent, resulting in a value (rounded) of $829,600. To this he added the one acre of excess land valued at $27,300, for a total value of $856,900.

The appraiser used other specific techniques within the income approach, such as the discounted cash flow. Although, the appraiser's work was reasoned and supported by data, it raises questions in the court's mind. For example, the equity yield rate was only one-quarter of one percent more than the overall capitalization rate and the same as the debt rate. The similarity between defendant's overall capitalization rate and his discount rate implies very little potential for appreciation in the value of the property. Also, to have an equity yield rate the same as the debt rate implies the same level of risk, which is not consistent with reality.

The disparity in the positions of the parties raises obvious questions. How can a thorough, well-reasoned appraisal be so far off? If it is not far off, then how can we explain the price of the pending sale, even conceding that there have been changes in the market? Plaintiff purchased the property for $558,000 in 1986 and is selling it, except for one acre with an estimated value of $27,800 to $30,000, in

1991 for $497,000. In this case, the subject property is being purchased by plaintiff's immediate neighbor and competitor. Reasonably, this buyer could afford to pay more for the subject property than other market buyers because, as plaintiff points out, it will allow the buyer to incur less expense. The buyer can combine two separate facilities into one and eliminate duplication of managerial, advertising and other expenses. This buyer also increases the size of his facility and eliminates a direct competitor. The evidence supports plaintiff's position that the larger units have a lower expense ratio because of their economies of scale.

■    In appraising self-storage facilities, the appraiser should mimic the market. If plaintiff's position is correct, the appraiser should use actual net income and ascertain market value based on the factors used by buyers of existing self-storage facilities. The other traditional approaches may not be as applicable, or if applicable, as persuasive if the market does not analyze the properties in the same way. To achieve market value, the appraiser must use the data and the methods the market uses.

■    The court's experience and practice of analyzing real estate value using the traditional approaches inclines it to give weight to those approaches. They provide a reasoned analysis which should make sense in the market. However, in this case, plaintiff's largely undisputed evidence as to the methods of marketing and valuing self-storage property appears valid. The biggest weakness in plaintiff's case is he submitted no market evidence, no data and no comparable sales to support his position. The only thing plaintiff submitted was a pending sale of the subject property. While an actual sale of a subject property is given great weight (*see Kem v. Dept. of Rev.*, 267 Or 111, 514 P2d 1335 (1973)) it is greatly diminished here because the "sale" has not closed and it is almost two years after the assessment date.

Many questions can be raised about the sale and some have been raised here. The immediate and first question is whether it is an arm's-length sale between knowledgeable parties acting without duress and meeting all the other conditions of the definition of a market transaction. Based on the evidence, the court is not persuaded that it is a market transaction.

The subject's NOI for the three years prior to the assessment date was $54,876 for 1987, $61,032 for 1988 and $79,324 for 1989, for an average of $65,077. Defendant's appraiser used a capitalization rate of 10.75 percent, while plaintiff's expert preferred 12 percent, within a range of 10.5 to 12 percent. Of defendant's comparable sales, the more recent sales averaged 10.8 percent, the most recent was at 11 percent and the sales occurring in the more immediate area averaged 11 percent. The court finds 11 percent the most probable market rate. Dividing the three-year average NOI of $65,077 by a capitalization rate of 11 percent gives an indicated value of $591,609.

■　　　　This same approach can be used to determine an indicated value for the year of sale. The buyer's offer was made in September, 1991. The NOI for the three immediately preceding years was $61,032 for 1988, $79,325 for 1989, and $73,234 for 1990, or an average of $71,197. Dividing $71,197 by a capitalization rate of 12 percent gives an indicated value of $593,308. Based on his testimony, plaintiff's own witness should be willing to pay $593,000 for the subject property. Or, looking at it from another point of view, dividing $71,197 by the sales price of $527,000 indicates a capitalization rate of 13.5 percent. This is significantly higher than either side considered reasonable and suggests that there may be other conditions or factors not brought to the court's attention.

Even though plaintiff is not compelled to sell, this may be the case of a big fish swallowing a small fish. Plaintiff has been actively trying to sell this property for three years. No buyers have come forward. Plaintiff is scaling back his Oregon operations and enlarging his self-storage business in Florida. For whatever reason, perhaps due to the increased competition, plaintiff accepted an offer that is $63,000 below the market value indicated by his own approach.

Another question relates to the changes in the market since the assessment date. There is no doubt that the market has changed. The competition has increased in the form of two new facilities plus an addition to an existing facility. Defendant suggested that the low sale price may reflect this competition. Nevertheless, defendant's appraiser testified that the market demand is strong. As of the date of the appraisal, he felt ''the subject's future success is

assured." Perhaps the market did experience some decline. However, the court has trouble accepting the argument that the market fell nearly 40 percent in less than two years. Plaintiff's expert testified that rent concessions now being given were also being given in 1989. The court finds it significant that the gross income of the subject property increased in 1990 over the prior years.[2]

Defendant's value of $860,000 substantially exceeds the cost approach. This could indicate that established, operating, profitable facilities with a proven market sell for more because they avoid the risks and delays of construction and start-up. Yet, in this case, during the time the subject property was for sale, two new facilities were constructed. Defendant's appraiser testified that new facilities are easy and inexpensive to build. These two characteristics suggest that self-storage facilities are easy marks for competition. The appraiser, nevertheless, believed that the demand was great enough to fill those new units. There was no evidence that the market did not readily absorb the new units. The subject's increasing income certainly suggests that the new units did not cause plaintiff to lower its rents or incur unusual vacancies.

Based on the evidence adduced, the court finds that the true cash value of the subject property as of January 1, 1990, was $590,000. Costs to neither party.

---

[2] Although the net income was down for 1990 over 1989, this is due to a $15,000 expense for reroofing some of the buildings. The 1990 net income was still more than either 1987 or 1988.